## HOUSTON CHRONICLE PUB. CO. v. THOMAS.  (No. 8455.)

(Court of Civil Appeals of Texas. Galveston. April 18, 1924. Rehearing Denied May 15, 1924.)

**1. Libel and slander ⟐10(3)—News article that sheriff was absent from office when wanted held not libelous; "nonfeasance."**

A news item to effect that plaintiff sheriff was absent from his office when a deputy phoned, resulting in escape of murderer and a three-year search, and further stating that there was delay in getting a warrant, *held* not libelous as charging sheriff with dereliction of public duty, as absence from office is not "nonfeasance" (quoting Words and Phrases, Second Series, "Nonfeasance").

**2. Evidence ⟐48—Common knowledge that sheriff not always found in his office.**

It is common knowledge that a sheriff in discharge of responsible duties is not expected to be always found in his office.

**3. Libel and slander ⟐19—Effect publication would have on mind of ordinary reader determines whether defamatory.**

In determining whether a publication was defamatory, question is what effect did it have upon mind of ordinary reader.

**4. Libel and slander ⟐19—Language used must be susceptible of defamatory meaning.**

Unless language in publication is reasonably susceptible of defamatory meaning, it cannot form basis of charge of libel.

Appeal from District Court, Galveston County; J. C. Canty, Judge.

Suit by Henry Thomas against the Houston Chronicle Publishing Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Frank S. Anderson, of Galveston, and Huggins, Kayser & Liddell, and Wolters, Storey, Blanchard & Battaile, all of Houston, for appellant.

Marsene Johnson, Elmo Johnson, Roy Johnson, and Marsene Johnson, Jr., all of Galveston, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against appellant to recover damages for the alleged publication and circulation of false and libelous statements concerning appellee. The alleged libel is predicated upon the following article which appeared in the Houston Chronicle, a newspaper published by appellant, on September 2, 1921:

"Loss of Valuable Half Hour Led to Three-Year Search.

"Had Sheriff Henry Thomas of Galveston been in his office one day in January, 1919, there would have been no need for a three-year search for Dr. Hadley. But the sheriff was not available when sought by Deputy McCracken of League City, and the loss of a valuable half hour gave the physician the start he needed.

"A news dispatch, printed January 24, 1919, carried the information of Dr. Hadley's indictment on a charge of wife murder. At that time the former army officer was practicing medicine in the Friendswood-Dickinson-League City community. In fact, he was in his auto near the interurban depot when a late edition of the Chronicle, carrying a story of his indictment, arrived there. The presumption is that he read the article that so vitally concerned himself, hurried to the home of his aged father at Friendswood, told him good-by, and left.

"Less than an hour after Dr. Hadley left his father's home a squad of Galveston deputies reached there in quest of him. They would have gone to Friendswood earlier had they been able to secure a warrant. When the warrant was procured it was too late."

"Protested His Innocence.

"In a telephone conversation with the Chronicle Dr. Hadley's father stated that his son had protested his innocence to him, but had added that there was only one living man who could prove it.

"It was believed that Dr. Hadley was reading the story of his own indictment just about the time the deputy at League City was endeavoring to get in touch with the sheriff.

"Before the actual news of the Hadley indictment had reached League City a telegram was received there, addressed to the chief of police. It was from police headquarters at Richmond, Va., and advised the Texas officers that Hadley was wanted.

"Dr. Hadley was watched before the indict-

ment was published, but League City had no warrant for his arrest."

### "Father's Statement Then.

"Dr. Hadley's father told the Chronicle he knew nothing definite of the circumstances surrounding the death of his son's wife; that his son had not informed him, but that he understood she had jumped from a boat while in a delirium. He said that his son was a graduate of the medical department of the University of Texas, at Galveston, enlisted in the medical corps of the army from Oklahoma, was given the rank of lieutenant, and sent to a government hospital at West Hampton, Va.

"The father said that his son had left Virginia a few weeks previously, and had come to Friendswood to practice in that section.

"The Richmond police claimed in January, 1919, that Hadley was in Richmond when, it was alleged, he wrote Mrs. Hadley's relatives in various parts of the country that she had died November 24 at Porto Rico.

### "Woman's Body Found.

"An Ohio angle to the case was developed January 29, 1919, when Mrs. A. H. Evans, of Cincinnati, identified the body of a woman found in the James river, near Richmond, Va., as that of her sister, Mrs. Wilmer Ames Hadley, wife of the Texas army surgeon.

"Cincinnati police said January 29, 1919, that Dr. Hadley was in Richmond when he wrote to relatives of his wife that she died of influenza in Porto Rico during the previous November.

"Mrs. Hadley's maiden name was Sue Kathleen Kinsley, prominently known in musical circles of Cincinnati. She was about 40 years of age, or 13 years her husband's senior. They were married in 1913.

"A romantic love meeting between Miss Kinsley and Dr. Hadley took place, so relatives say, in Houston, where Miss Kinsley had established a music studio, following a tour of the state.

"Cincinnati police, after questioning Mrs. A. H. Evans, who claimed that the dead woman was her sister, said Mrs. Evans had received a letter from Doctor Hadley, dated December 5, 1918, stating that his wife had died in San Juan.

"This letter was mailed in Atlanta, Ga., December 7. Doctor Hadley, it developed, had received his discharge December 4, and left the hospital the following day. So it was presumed that the letter was written in Richmond and he deferred mailing it until he reached Atlanta."

After setting out the first two subdivisions of the published article above quoted, plaintiff's petition contains the following allegations, which are copied from appellee's brief:

"That the publication made of and concerning him was libelous, in that the first paragraph of the publication directly, impliedly, and by innuendo charged him with a dereliction of his public duty as sheriff of Galveston county, charged him with carelessness and nonfeasance in office, and falsely informed the people of Galveston county that he was sought for in his office in the month of January, 1919, by one of his deputies, and that he was not available; that by reason of appellee's neglect and carelessness Dr. Hadley secured time in which to escape arrest from the crime of murder. Appellee further alleged that the publication was wickedly, recklessly, wantonly, and falsely made, published and circulated, and without any effort on the part of the defendant to ascertain and determine the truth. Appellee further alleged that he was in his office during the daylight hours of the day referred to in the article published in defendant's newspaper, and was available and could be located by telephone or by visit to him. Appellee further alleged that he was not sought for by a person whose name was McCracken on the day in question, and that during his entire tenure of office he never had in his employ a deputy bearing such name, all of which appellant could have discovered if it had, by the use of ordinary care on its part, intended to publish the truth and news without imputing to appellee that he was neglectful of his duties, that he had secreted himself and could not be found in the county nor in his office after diligent search by one of his deputies; that said publication held appellee up and exposed him to ridicule and contempt, and has caused him to be subjected to hatred, scorn, and abuse by many of his constituents and friends in Galveston county, and caused him to suffer grief, shame, humiliation, distress, and anguish of mind.

"Appellee further alleged that the article gave the reading public of Galveston county, in which he lived, the false impression that he, as sheriff, had power to issue and sign warrants for the arrest of criminals, and conveyed to the reading public that he had carelessly neglected to do so until it was too late to arrest the criminal before his escape, and that by reason of his carelessness, negligence, and nonfeasance, a three-year search for said criminal on the part of the peace officers of the state of Texas and of all the peace officers of the United States of America was necessary.

"Appellee further alleged that the reading public of Galveston county believed the statements in said newspaper to be true, all of which was a reflection upon his good name as a public official, sheriff, and officer, and has caused him to lose the friendship of many of his friends and citizens of Galveston county, in which county he has resided since the day of his birth."

The defendant answered by general demurrer and special exceptions, attacking the petition on the ground that the publication upon which the alleged libel is sought to be predicated is not susceptible of the construction and meaning given it by plaintiff, and that plaintiff by the innuendoes alleged in the petition attempted by a forced and unreasonable construction of the language used in the publication to enlarge and change its meaning; the answer also denied generally and specially the allegations of the petition, and specially pleaded that the publication set out in the petition was not libelous or contained any language susceptible of being so construed; "that if defendant were mistaken that plaintiff was sought by Deputy Sheriff McCracken on the date mentioned in said article, and in plaintiff's petition, nevertheless it was true that on said date plain-

tiff was sought by Deputy Sheriff McFadden, of League City, or some other deputy sheriff; that through mistake the name of the deputy sheriff mentioned in said article was given as 'McCracken' instead of 'McFadden'; that the publication made the basis of plaintiff's suit was privileged, in that said publication was a reasonable and fair comment or criticism of the official acts of plaintiff herein as sheriff of Galveston county, and further that said article or publication contained a reasonable and fair comment or criticism of other matters of public concern, and was published for the general information of the public; that the statements and averments contained in said publication were true, and the truth of said statements and averments were pleaded by defendant as a defense to plaintiff's cause of action, and further that, if any of the statements contained in said article of publication were not true, same were made in good faith, in the honest belief of its truth, and further that defendant had just and reasonable grounds and probable cause for entertaining such belief and for making the publication," and denying that said publication was made with any "malicious intent or with any intent to injure the reputation of plaintiff or to expose him to public ridicule or contempt, or subject him to hatred, scorn, and abuse, or in any way injure plaintiff."

All of the exceptions to the petition were overruled. The case was submitted to a jury in the court below upon special issues, and in response to the issues submitted the jury found that the statements contained in the publication complained of by plaintiff were not substantially true; that such statements were not a reasonable and fair criticism of the official acts of plaintiff, and were libelous; and that plaintiff was entitled to $10,000 as compensatory damages, but was not entitled to recover exemplary damages. Upon the return of this verdict judgment was rendered thereon in favor of plaintiff against the defendant for the sum of $10,000.

The only issue of fact raised by the evidence was whether plaintiff was in his office when Deputy Sheriff McFadden first sought to communicate with him from League City to obtain his authority or sanction for the arrest of Dr. Hadley.

The undisputed evidence shows that the deputy got plaintiff over the telephone about 6 o'clock on the afternoon of January 24, 1919, and plaintiff at once sent deputies from his office to go with McFadden and make the arrest. After these officers reached League City, there was some delay in obtaining a warrant of arrest from a justice of the peace, and Dr. Hadley had left the home of his father before the officers arrived there, and they were unable to apprehend him.

There was evidence tending to show that McFadden had called for plaintiff over the telephone earlier on that evening, and failed to get him, but the finding of the jury that this did not occur is sustained by sufficient evidence. The plaintiff had no deputy named McCracken.

The evidence conclusively shows that defendant was not actuated by malice in making the publication, and had no intention of injuring or reflecting upon the personal or official conduct of the plaintiff.

Under appropriate assignments and propositions the appellant first assails the judgment on the ground that the trial court erred in not sustaining the general demurrer to the petition.

[1, 2] We agree with appellant that the language of the publication complained of by appellee is not reasonably susceptible of the defamatory meaning sought to be given it by the innuendoes alleged in the petition. If the statement in the petition that the appellee was not in his office when his deputy called for him had been true, it could not have caused any just or reasonable criticism of the officer. It is a matter of common knowledge that a sheriff in the discharge of the responsible duties of his position is not expected to be always found in his office, but on the contrary, when, as shown by the evidence in this case, such officer personally performs the active duties of his office in keeping the peace, ferreting out offenses against the law and arresting the offenders, he must spend much, if not most, of his time out of his office. This being so, how could the statement that a sheriff was out of his office during a half hour of a certain day be reasonably construed as a charge of neglect of duty?

In Words and Phrases, Second Series, nonfeasance is defined as follows:

"Nonfeasance is the omission of an act which a person ought to do. Nonfeasance is the nonperformance of some act which ought to be performed."

Bouvier's Law Dictionary defines nonfeasance as follows:

"Nonfeasance is the nonperformance of some act which ought to be performed."

It not being the duty of the sheriff to remain in his office at all times, a charge that he was absent from his office on one occasion would not constitute a charge of nonfeasance, or neglect of duty.

It goes without saying that the mistake in the name of the deputy was wholly immaterial and could furnish no basis for a charge of libel against appellant.

The statement in the publication that attempted apprehension of Dr. Hadley was delayed because of the inability of the officers to promptly secure a warrant was shown to be true, but, if it had been false, that statement in the publication could not reasonably be understood to mean, as alleged in the petition, that appellee had the power to issue

warrants for arrest of persons charged with crime, "but had carelessly neglected to do so until it was too late to arrest Dr. Hadley before his escape from Galveston county." It was entirely independent of the statement that appellee was not in his office when his deputy called for him, and, as the sheriff under our law has no authority to issue warrants of arrest, the statement could not reasonably be construed to mean that appellee had authority to issue the warrant and had negligently failed to perform his duty in that regard.

[3] It is well said by our Supreme Court in the case of Belo v. Smith, 91 Tex. 225, 42 S. W. 851, in discussing the question of when language should be held libelous:

"The question is, what effect would the publication have upon the mind of the ordinary reader? What construction would he have put upon it? For in defamatory language, it is not so much the idea which the speaker or writer intends to convey, as what he does in fact convey. It is the effect upon the character of the person alleged to be defamed by the utterance which the law considers, and therefore the utterer uses the language at his peril."

[4] But this is only true when the language used is susceptible of defamatory meaning. The law is well settled that unless the language used is reasonably susceptible of a defamatory meaning it cannot form the basis of a charge of libel.

In Ruling Case Law, vol. 17, pp. 396–398, the doctrine is thus stated:

"The general effect of the innuendo is to explain matter which has been already sufficiently expressed before; the import of the words used it cannot enlarge, extend, or change. It has also been held that in determining whether a publication is libelous per se the court is confined to the language employed in the publication, and cannot look to the innuendo alleged in the petition. * * * The innuendo cannot aver a fact, or do anything more than refer back to some facts stated in the inducement, and if the inducement is wanting the deficiency cannot be supplied by the statement of the facts in the innuendo. Moreover, although of course if the words used are ambiguous or equivocal, the innuendo may assign the true meaning the plaintiff believed them to bear, if the words alone, or the words illuminated by circumstances duly pleaded, are not defamatory, the innuendo cannot make them so; nor is it competent to aid an innuendo by the opinions of witnesses. An innuendo may be rejected as surplusage if not borne out by the words alleged to be defamatory, or if the words are actionable per se, or if the innuendo is clearly not needed, or if there is an untrue claim in the innuendo, and the words themselves are capable of a libelous meaning. * * *

"The question as to whether or not an innuendo in a petition in an action for libel or slander is fairly warranted by the language declared on is for the court. The court may determine as matter of law that an innuendo seeking to give words of hidden meaning a libelous

intent is forced and unnatural, and that therefore no libel is alleged, notwithstanding a constitutional provision to the effect that in libel suits the jury shall, under the direction of the court, determine the law and the facts. The law on this question has been otherwise stated as follows: The truth of the innuendo is for the jury; but the quality of an alleged libel, as it stands on the record, either simply, or as explained by averments and innuendoes, is purely a question of law for the court, and in civil cases it is bound to instruct as to whether or not the publication is libelous, supposing the innuendoes to be true."

In the case of Hendrix v. Mobile Register, 202 Ala. 616, 81 South. 558, the Supreme Court of Alabama said:

"While a statement, in order to be defamatory of one in respect to public office need not import a charge of crime, yet it must go so far as to impute to him some incapacity or lack of due qualification to fill the position, or some positive past misconduct which will injuriously affect him in it, or the holding of principles which are hostile to the maintenance of government. Sillars v. Collier, 151 Mass. 50, 23 N. E. 723, 6 L. R. A. 680."

The Supreme Court of Alabama, in the case last above quoted from further said:

"An innuendo serves merely to explain matter already expressed, or to point out where there is precedent matter. It may apply to what is already expressed, but cannot add to, * * * or change the sense of the words of the publication. * * *

"It is for the court to say whether the meaning charged by the innuendo can be legally attributed to the language used in the publication, and for the jury to ascertain whether the intent charged be true in fact. If this inquiry is decided * * * adversely to the pleader, this puts an end to it, for it is not permissible to make proof that the words employed were uttered in the sense or with the meaning imputed to them in the innuendo. That is not the subject of proof."

In the case of Cotulla v. Kerr, 74 Tex. 89, 11 S. W. 1058, 15 Am. St. Rep. 819, our Supreme Court said:

"When a libelous publication relates to a person in office it may affect him in his personal or official character. If it relates to him personally alone it is governed by the same rules that apply to an individual. If it applies to him as an officer the better opinion seems to be that to make it actionable per se the charge must be of such a nature that if true it would be cause for his removal from office."

We think under the principles and rules of the law of libel as enunciated in the authorities above cited the petition failed to allege a cause of action against the appellant, and the general demurrer should have been sustained.

Having reached the conclusion, it becomes unnecessary to consider the other assignments of error presented in appellant's brief.

From our construction of the language of

the publication complained of, no case of libel can be predicated thereon by any amendment of the petition.

It follows from these conclusions that the judgment of the trial court should be reversed and judgment rendered for appellant, and it has been so ordered.

Reversed and rendered.

### On Motion for Rehearing.

In his motion for rehearing counsel for appellee calls our attention to an inaccurate statement in our opinion heretofore filed in this cause. We say in our opinion:

"The undisputed evidence shows that the deputy got plaintiff over the telephone about 6 o'clock on the afternoon of January 24, 1919, and plaintiff at once sent deputies from his office to go with McFadden and make the arrest. After these officers reached League City there was some delay in obtaining a warrant of arrest from a justice of the peace, and Dr. Hadley had left the home of his father before the officers arrived there, and they were unable to apprehend him."

The record fails to sustain the statement that the undisputed evidence shows that "after these officers reached League City there was some delay in obtaining a warrant of arrest from a justice of the peace." On the contrary, Deputy McFadden testified that he had talked to the justice of the peace at League City about the desirability of having a warrant for Dr. Hadley's arrest before he telephoned the appellee, but did not ask the justice to issue the warrant, and there is no evidence that any warrant was sought after the deputy sent by the appellee arrived at League City.

The erroneous statement in the opinion above quoted is, we think, wholly immaterial, but our desire to be accurate in our statements of the evidence prompts us to make this correction.

After giving the motion for rehearing due consideration, we feel constrained to adhere to the conclusion expressed in our former opinion, and refuse the motion.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes